UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 216 |
| v. | ) | |
| | ) | |
| JOHN THOMAS | ) | Judge James B. Zagel |

**UNITED STATES' POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, hereby submits the following sentencing memorandum concerning its position for sentencing. The government submits that the advisory sentencing guideline range in this case is 33 to 41 months' imprisonment. The government recommends a sentence above the sentencing guideline range of approximately 57 months' imprisonment. Defendant's fraud on the Village of Riverdale is a serious crime, defendant has committed other criminal acts in addition to the Riverdale fraud, and he has violated almost every one of the Court's bond conditions imposed when it authorized his release. As such, a sentence of 57 months' imprisonment, and above the sentencing guideline range, takes into account the aggravating factors in this case.

**I.     Introduction**

Defendant John Thomas is a serial con man. Within months after release from probation from another federal conviction, defendant set out to defraud the Village of Riverdale through the use of the Village's Tax Increment Financing program. While defendant stole approximately $370,000 out of the $900,000 in TIF funds for his own personal benefit, the actual

1

loss in this case understates the offense. Defendant left the Riverdale marina in shambles – unfinished and straddled with unpaid contractor liens and debt, which essentially made the Riverdale marina inoperable and effectively unsellable. In addition, defendant Thomas has engaged in seven different fraud scams in an attempt to generate illicit funds during and after the Riverdale fraud. These scams can be considered by the Court pursuant to Title 18, United States Code, Section 3553(a) as indicative of defendant's character, lack of respect for the law, high potential for recidivism, and need for specific deterrence. The same is true for defendant's behavior while on bond, where he engaged in a plethora of schemes to use the phone, internet and meet with a witness, all in violation of the Court's release order. In his most recent scam, defendant concocted a plan to fool his psychiatrist for a bipolar disorder diagnosis in order to receive a lower sentence from this Court. Accordingly, defendant is richly deserving of a sentence above the sentencing guideline range.

## II.     Offense Conduct

Defendant pled guilty pursuant to a written plea agreement to one count of wire fraud, in violation of Title 18, United States Code, Section 1343. In his plea agreement, defendant admitted the facts of the Riverdale marina fraud, as detailed below.

Defendant Thomas owned and controlled Nosmo Kings, LLC, an Illinois limited liability company operating at 215 W. Ontario Street, Chicago, Illinois. In or about August 2011, defendant Thomas, on behalf of Nosmo Kings, purchased an 11-acre property in Riverdale, Illinois, located at 13100 South Halsted Street, which was commonly known as the Riverdale marina. On or about February 7, 2012, Nosmo Kings entered into a Tax Increment Financing

2

agreement with the Village of Riverdale. The Village of Riverdale's TIF program allowed for the use of taxpayer funds for the redevelopment of certain property in the Village of Riverdale. Under the TIF agreement, the Village of Riverdale agreed to reimburse Nosmo Kings's expenses incurred for the renovation of the Riverdale marina of up to $1.2 million. The TIF funds were to be disbursed to Nosmo Kings in four phases, which were to occur after Nosmo Kings's expenditure of funds, and completion of each construction phase on the Riverdale marina. Each disbursement was not to exceed $300,000.

In order to obtain TIF funds from the Village of Riverdale after the completion of each construction phase, defendant Thomas was required to submit a Certificate of Substantial Completion and a Certificate of Reimbursable Redevelopment Project Costs. The Certificate of Reimbursable Redevelopment Project Costs identified each construction expense that Nosmo Kings incurred on the Riverdale marina during the identified construction phase. Defendant Thomas was required to submit supporting documents for each of the identified construction expenses, such as invoices from the vendor that undertook the construction expense, or copies of checks paid to the vendors. Defendant submitted some of these documents to the Village of Riverdale, and also directed Individuals A and B, his employees, to submit other documents to the Village of Riverdale.

Between January 2012 and April 2012, defendant Thomas undertook construction work to renovate the Riverdale Marina using TIF funds. However, in order to ensure his receipt of the full amount of TIF funds for each construction phase, defendant Thomas submitted Certificates of Reimbursable Development Project costs and supporting documents that falsely

identified certain expenditures for the Riverdale marina that were not made.   Defendant Thomas used these TIF funds to pay personal expenses and debts that he had incurred, and that were not related to the Riverdale marina.   Defendant Thomas also directed Individuals A and B to create false and fraudulent documents, including invoices, in order to support his TIF submissions.

In the Nosmo Kings Phase I Certificate of Reimbursable Redevelopment Project Costs, defendant Thomas submitted false information claiming that Nosmo Kings had made the following expenditures on the Riverdale marina: (1) $22,994 to Company OB for an insurance policy; (2) $131,935 for construction costs paid to Company GC; and (3) $8,815.38 paid to Company EJ for roofing work.   At the time that defendant Thomas made these representations, he knew that Nosmo Kings had not paid any insurance premium to Company OB; that it had not paid Company GC $131,935 for construction work; and that it had only paid Company EJ approximately $4,500 for its work and not $8,815.38.

In the Nosmo Kings Phase II Certificate of Reimbursable Redevelopment Project Costs, defendant Thomas submitted false information claiming that Nosmo Kings had made the following expenditures on the Riverdale marina: (1) $56,588.58 for construction supplies; (2) $25,750 to Company ND for construction supplies; (3) $33,500 to Law Firm LB for legal expenses; (4) $8,250 to Company NS for sewer and septic tank work; and (5) $5,000 to Law Firm RA for legal expenses.   At the time defendant Thomas made these representations, he knew that he had not expended $56,588.58 for construction supplies; the $25,570 to Company ND was used to repay a personal loan; the $33,500 was paid to Law Firm LB for legal services that were not related to the Riverdale marina; the $8,250 was used to pay rent for his personal

residence; and the $5,000 to Law Firm RA was used to pay legal expenses for a personal matter for Individual B, defendant Thomas's office assistant.

In the Nosmo Kings Phase III Certificate of Reimbursable Redevelopment Project Costs, defendant Thomas submitted false information claiming that Nosmo Kings had made the following expenditures on the Riverdale marina: (1) $8,350 to Company NS for sewer and septic tank work; (2) $15,000 to Company GT; (3) $25,000 to Company WV for the installation of a septic tank; (4) $7,500 to Law Firm AM for legal expenses; and (5) $20,000 to Attorney TN for legal services.   At the time defendant Thomas made these representations, he knew that the $8,350 was used to pay rent on his personal residence; that Company GT and Company WV were fictitious companies that did not exist, and did perform any work on the Riverdale marina; that the $7,500 to Law Firm AM was for legal services not related to the Riverdale marina; and that the $20,000 check to Attorney TN was for repayment of a personal loan, and not for legal services related to the Riverdale marina.

During the scheme, defendant Thomas prepared and directed the preparation of false invoices purportedly from Law Firm LB, Company GT, Company NS, Company WV, Attorney TN, and Law Firm AM, and submitted these documents to the Village of Riverdale in support of his TIF submissions.

Defendant Thomas, through Nosmo Kings, received a total of $900,000 in TIF funds from the Village of Riverdale.   Of that amount, defendant Thomas fraudulently obtained $374,182.96 in TIF funds through false and fraudulent Certificates of Reimbursable Redevelopment Project Costs and supporting documents.

5

### III.    Defendant's Other Criminal Conduct

During its investigation of defendant, the government discovered other additional scams that defendant was directing, even after defendant was aware that the government was investigating his use of TIF funds designated for the Riverdale marina.    The exhibits attached to the PSR contain supporting evidence for each of these scams, as detailed below:

1. **Fake Proof of Funds letter.**    In approximately November 2013, defendant attempted to purchase a piece of property from Bank of America.    In connection with that, defendant submitted a PNC Bank proof of funds letter to Bank of America that stated defendant "has sufficient liquid assets in the low seven figures to place as a down payment or purchase real estate." Ex. C.[1]   A Bank of America investigator determined the letter was a forgery from his investigation. Ex. D.    In addition, the FBI determined that the phone number listed on the letter is that of Individual MG, defendant's former employee. Ex. E. Individual MG was also defendant's employee and never a banker at PNC Bank. Defendant has also stated multiple times in court that he had no assets or source of income, and indeed, filed a motion to distribute $100,000 that was held in his attorney's trust account, which defendant claimed was his only source of funds at the time.    Thus, the claim that defendant had funds in the low seven figures was false.    The purchase of the property never went through.

2. **False loan application**. In approximately October 2013, defendant attempted to obtain a loan, under his mother's name, from the State Bank of Countryside.    Emails between

---

1 All exhibits referenced herein are to the government's version attached to the PSR.

defendant and the State Bank of Countryside show that Thomas was behind the loan. Ex.
F. Thomas used his mother as a front because he had a prior criminal conviction and
civil judgment orders. The loan document stated that defendant's mother owned 215 W.
Ontario, Chicago, Illinois. A search of title records showed this information is false,
and the true owner of the property, Individual GU, said that defendant was not an owner
of this property. Ex. G. The application also stated that defendant's mother owned a
2012 Mercedes, but the date of acquisition was listed as 2007. The application stated
that Thomas's mother owned 363 W. Erie, Chicago, Illinois, but Individual GU
confirmed that Thomas did not have an ownership interest in the property. Ex. G. The
loan was not approved.

3. **Credit Card Fraud**. In approximately October 2013, defendant, together with certain
co-schemers, attempted to process expired gift and credit cards through the credit card
processing terminal at the Riverdale Marina. *See* Ex. H and I. In total, defendant,
together with the co-schemers, charged approximately $76,000 in charges on these
expired cards through a process called "force sale." The processing company, however,
was suspicious and asked for copies of invoices to confirm that the charges were
authentic. Defendant Thomas created false invoices and submitted them to the
processing company. *Id.* The processing company never approved the charges, and thus
defendant was unsuccessful in obtaining the funds.

4. **Fake Letter Claiming Ownership of Items at the Marina**. Defendant Thomas
prepared a fake letter dated November 1, 2011 that stated that Nosmo Kings, LLC sold

7

defendant a large number of items at the marina for $1.00. Ex. J.   Defendant provided this letter to the court-appointed receiver for the Village of Riverdale as proof that the receiver did not have custody and rights to all property at the marina.   Through this letter, defendant claimed that because the property was allegedly defendant's personal property, he could sell it and retain the proceeds of the sale. Ex. K.   However, according to Individual SW, she witnessed defendant create this letter in 2013, and defendant told Individual SW that he was creating and backdating this document so that he could sell the property for a profit. Ex. L.   Defendant also told Individual SW that after the property was sold, he would scam the insurance company and file a claim reporting the property stolen. *Id.*   Defendant's other office assistant, Individual MG, also confirmed that the letter was fake. Ex. E.   The receiver discovered the scam and defendant did not control over any property.

5. **Fake letter from the Village of Riverdale in Marina Sale**.   In 2013, defendant Thomas purportedly sold the Riverdale marina to two individuals for $30,000. Ex. M. As part of that sale, defendant Thomas provided a letter purportedly from the Village of Riverdale and purportedly signed by the Mayor that stated the Village was releasing defendant from all claims in exchange for defendant's payment of $500,000 to the Village.   This letter was fake.   Thomas created this fake letter, and he never paid $500,000 to the Village. Ex. N.   As a result, the marina sale was fraudulent, and defendant scammed these individuals out of $30,000.

6. **Fake Babe Ruth Baseballs.**   In December 2013, defendant Thomas purchased one

replica Babe Ruth baseballs and one Ty Cobb, Babe Ruth, dual-signed baseball on eBay for a total of approximately $150. Ex. O.   According to Individual SW, defendant told her he was going to pass these baseballs off as authentic and use them to pay debts. Ex. L.   According to Individual LB, defendant's former attorney, Thomas gave him a baseball and told him it was an authentic Babe Ruth baseball, and that it was security for the debt that he owed Individual LB. Ex. P.   Defendant also attempted to convince Individual SW to sell the fake ball as authentic for money, but Individual SW refused. Ex. L.

7. **False Liens in the Purchase of Prairie Pointe Medical**.   In approximately early 2014, defendant filed false and bogus liens on a property called Prairie Pointe Medical Office in Hoffman Estates, Illinois. Ex. R.   Defendant filed these liens to essentially delay a closing set to take place. Ex. S.   In one lien, defendant claimed to own 50% of Prairie Pointe, but a search of real estate records show this was false.   In order to have defendant release these bogus liens, the parties were willing to pay defendant $10,000 to remove these liens so that they could close.   Thus, defendant planned to extort the parties out of $10,000.   The payment was not made, and the deal for the sale of Prairie Pointe never closed.

## IV.    Defendant's Violations While on Bond

A more detailed explanation of defendant's violations while on bond, with supporting exhibits, is contained in PSR, Ex. A.   Defendant was prohibited by the Court from using the phone and internet, and was placed on home detention and electronic monitoring.   Despite this

order, defendant engaged in the following conduct:

1. Defendant used his wife's cellphone and a device called Google TV to access the internet.

2. Defendant provided individuals with his login name and password of an email account and instructed them to leave messages in the "draft" section of the email account so that he could retrieve messages from them.

3. Defendant sent text messages from his wife's and mother's cellphone, and from a 304 area code using an online service called text plus where he adopted the nickname "Joe Momma" to communicate with individuals.

4. Defendant met with Individual SW while he was on home detention and electronic monitoring, and obtained a note from his dentist that extended the time of his absence from his home so that he could meet with Individual SW. Defendant provided the fraudulent note to Pretrial Services as alleged confirmation of his visit to the dentist.

**V.  Defendant Attempts to Fake a Bipolar Diagnosis**

Defendant, through his attorneys, requested permission to have a psychologist evaluate defendant for a potential bipolar disorder diagnosis prior to sentencing.   The Court granted the request.   After that time, defendant engaged in several deceitful acts designed to ensure that he received a bipolar diagnosis to use as purported mitigation at sentencing.   The evidence below is obtained from defendant's recorded inmate phone calls from the MCC:

- During a recorded call, on July 12, 2014, Thomas's wife informed Thomas that

10

she was sending him the bipolar test questions to review. Thomas stated: "I just wanna make sure that as I'm answering questions randomly that I have an idea of which way I should be answering them." Attached as Ex. 1 to Suppl. PSR. Thomas' wife stated: "[P]ick a path and be consistent 'cause if it's inconsistent they're gonna assume the other …that you'll try to fake it." *Id.*

- During a recorded call on July 14, 2014, Thomas' wife told defendant about her meeting with the probation officer, and stated: "So I tried to play the sympathy card, I tried to, I shared with her your mother. I, you know, I tried to be, I tried to act like I was my poor pitiful self." Attached as Ex. 2 to Suppl. PSR.

- During a recorded call on August 14, 2009, Thomas's wife asks defendant whether he received the test she sent. She then proceeds to instruct him how to behave during the test, "I don't think there is a right-wrong answer. If I were you, I wouldn't finish the test is the other thing." Thomas's wife goes on to say, "I would kind of wring my hands and, you know, act like you're thinking and I would just kind of . . . take deep breaths and like look up in the sky." She continues to state, "And if, you know, if you can furrow your brow. If you can kind of like your shoulders rolled over, you know what I mean? Thomas's wife also advised defendant to "twitch your nose like a cat." Defendant replies, "Oh gotcha, gotcha, gotcha." Thomas's wife continues by stating, "Do the sniff thing . . . play with your ear." She advised defendant to practice these acts during a meeting the next day to "start creating the thing." Defendant replied, "I can do

11

that." Attached as Ex. 3 to Supp. PSR.[2]

Defendant underwent the bipolar test on September 25, 2014, October 1, 2014, and October 16, 2014. Dr. Hillman's report, dated January 10, 2015 diagnosed defendant as Bipolar Disorder I. Whether defendant's antics affected the diagnosis is not reflected in the report. Nevertheless, defendant's intent to fake conditions during bipolar testing, knowing that the Court is the ultimate recipient of the information, can be considered by the Court in imposing a sentence.

## IV.    Guideline Range Calculations

The government submits that the sentencing guideline range in this case is 33 to 41 months' imprisonment. The PSR denied defendant the reduction of three points pursuant to Guideline §3E1.1(a) and (b), and concluded that defendant had not accepted responsibility. In particular, the PSR pointed to defendant's other criminal conduct listed above, some of which was done after he was aware of the FBI's investigation into the Riverdale marina. The PSR also noted that defendant stated to a witness that he wanted to blame someone else for the Riverdale marina fraud. As a result, the PSR reached an offense level of 23, and a sentencing guideline range of 46 to 57 months.

At this time, the government supports the granting of the acceptance of responsibility

---

2 The Seventh Circuit has held in *United States v. Madoch*, 149 F.3d 596 , 602 (7th Cir. 1998), that communications between a husband a wife recorded by prison officials were not protected by the marital communications privilege because the communications were recorded, the prison monitored the recordings, and thus the communication was likely to be overheard by others. In addition, the communication about faking the bipolar testing falls within the joint criminal conduct exception because Thomas and his wife were discussing how to commit a fraud on the court by faking the bipolar test. *See e.g.* 18 U.S.C. §1512(c) (making it a crime to corruptly influence or attempt to influence an official proceeding).

reduction. Defendant has taken substantial steps in this case to demonstrate acceptance of responsibility for his crime. Near the end of the government's investigation, and before indictment, defendant had a number of proffer-protected interviews with the government where he admitted his illegal conduct. Shortly after those interviews, defendant made a statement under oath in which he fully admitted his involvement in the Riverdale marina fraud. Shortly after indictment, defendant pled guilty pursuant to a plea agreement in this case, where he again fully admitted his conduct in the fraud scheme. Thus, defendant has accepted the offense conduct in this case, which is an important factor used to assess acceptance of responsibility. *See* Application Notes 1(A) and 3 to Guideline Section 3E1.1.

Defendant's other criminal acts are reprehensible, particularly the ones that occurred after he was aware of the FBI's investigation. However, that conduct does not outweigh the other steps that defendant undertook to accept responsibility for the instant offense. In addition, defendant's claim to a witness that he intended to blame someone else for the fraud occurred after his under oath confession. Thus, it was virtually impossible for him to actually act on that statement. Balancing these competing actions, the government concludes that defendant has taken sufficient steps under Section 3E1.1(a) and the Application Notes to qualify for the 2-level reduction. Defendant's conduct weighing against the award of acceptance of responsibility reduction is better considered under the Court's analysis of the Section 3553(a) factors in imposing a sentence. However, and importantly, the government reserves its right to contest any reduction under Section 3E1.1 if defendant chooses to deny his other criminal conduct and bond violations at the sentencing hearing.

The government also anticipates moving for the third-point reduction under Section 3E1.1(b) because defendant pled guilty shortly after indictment and avoided the need for the government to expend resources preparing for trial. Accordingly, the government submits that the offense level is 20 and the sentencing guideline range is 33 to 41 months' imprisonment.

**V.      Defendant Should Be Sentenced to a Term of Imprisonment of 57 Months Under the Factors Set Forth in 18 U.S.C. §3553(a)**

The factors set forth in 18 U.S.C. 3553(a) warrant a substantial term of imprisonment for defendant Thomas. The nature and circumstances of the offense, the need for specific and general deterrence, and the need for just punishment and to promote respect for the law, all weigh in favor of a substantial term of imprisonment. In addition, defendant's other attempted scams and his bond violations should push this sentence above the sentencing guideline range. At defendant's request, the Probation Office has disclosed its recommendation to the Court and has recommended a sentence of 57 months' imprisonment, which is at the high end of the PSR's sentencing guideline range of 46 to 57 months. The government agrees with the Probation Office's recommendation and asks this Court to impose a sentence of 57 months' imprisonment.

**A.      Nature and Circumstances of the Offense**

The nature and circumstances of the offense are serious. Defendant was entrusted by the Village of Riverdale with taxpayer funds to restore the Riverdale marina. The Village had anticipated that its repair would promote economic growth and jobs in that area through the restaurant on its premises and the boat docking facility. Through its TIF program, the Village provided defendant $900,000 in taxpayer funds in four phases to repair the Riverdale marina. Instead, defendant siphoned off over $370,000 for his own personal benefit, which he then used

14

to pay personal debt and fund rental payments on his residence. To cover up his illicit use of funds, defendant submitted false and bogus invoices, often in the name of fictitious companies, to make it appear that funds had been used to construct the marina. Defendant created fake invoices in the names of Law Firm LB, Company GT, Company NS, Company WV, Attorney TN, and Law Firm AM, some of which were non-existent and fictitious entities.

Although a full accounting is difficult given that some of the TIF money was withdrawn in cash, defendant has maintained that most of the remaining TIF funds (approximately $500,000) were used for to repair the Village marina. Nevertheless, defendant's theft of over one-third of the Village's TIF money has caused significant harm to the Village. Attached to the PSR is a letter from the Village Attorney, which stated:

> Thomas has created nothing but hardship and embarrassment for the Village. The Village, and the community as a whole, is on the brink of financial insolvency; however, in hopes of a brighter future, the Village invested one million dollars in Thomas' alleged visit that was nothing but a hoax from the outset. At the expense of the Village, its schools, its parks and its children, Thomas enriched himself with taxpayer dollars and left the community with plundered property that is now riddled with tax liens and steeped in litigation and thereby incapable of being a productive component of the Village.

> To add further insult, Thomas has fought the Village at every turn and has cost the Village hundreds of thousands of dollars in Village staff hours, attorney's fees, accounting fees, and receiver fees.

The Village attorney also noted that the Village is embroiled in litigation over defendant's alleged sale of the marina for $30,000 using the fake letter from the Village Mayor. To date, defendant has failed to take any steps to turn the Riverdale marina over to the Village so that it can salvage what is left of it. The government submits that the economic harm reflected in the guideline range understates the seriousness of the offense in this case.

15

The nature and circumstances of defendant's fraud, together with the harm that he has caused, warrant a substantial sentence in this case.

### B.     History and Characteristics of the Defendant

There are numerous factors about this defendant's history and characteristics that weigh towards a lengthy sentence.   First, defendant has a prior federal criminal conviction for fraud out of the Eastern District of New York, where he was charged in 2001 and convicted in 2003, under his former name, Bernard Barton.   As recounted in the PSR, defendant made false statements to obtain funds for his personal use, including (1) fraudulent documents purportedly showing proof of commissions owed to defendant's companies which impeded deals set to close; (2) unauthorized use of credit cards; (3) sale of knowingly fraudulent sign licenses; and (4) fraudulent endorsement of checks.   This pattern of fraud is remarkably similar to defendant's illegal conduct in the Riverdale marina scam and his other scams identified above.   In addition, defendant clearly did not learn his lesson from that federal conviction, where he received probation, as it took him only four months from the termination of his probation to start his new scam at the Riverdale marina.

Defendant's behavior while on bond and his flagrant violation of bond conditions is indicative of defendant's character. It demonstrates his inability to conform his behavior to the law, shows a blatant disregard for the criminal justice system, and demonstrates a high risk of recidivism, all of which warrant a substantial term of imprisonment.

Defendant will likely contend that his previous status as a cooperator should warrant consideration in this sentencing.   The government disagrees.   It is true that defendant had

16

previously cooperated in a public corruption investigation, which led the government to recommend a Section 5K1.1 departure. However, his previous status as a cooperator should play no part in the sentence that he should receive for the Riverdale marina fraud. Defendant has received whatever cooperation credit that he was due at his previous federal sentencing hearing, and even received the benefit of a sentence of probation without any incarceration. Defendant has blown the second chance he was given in spectacular fashion, and a serious term of imprisonment is the only way to deter this defendant.

In addition, defendant's plea for a reduced sentence because of an alleged bipolar disorder should also be rejected. As detailed above, defendant engaged in a fraud on the Court by obtaining the bipolar test questions ahead of time, and scheming with his wife to fake his behavior during the testing in order to receive a favorable outcome. Defendant engaged in these acts well knowing the full extent of the trouble that he was in with the Court. These acts simply show that defendant will not stop unless he is incarcerated for a lengthy period of time.

### C.      Specific and General Deterrence

Defendant's prior federal conviction and his behavior on bond make a strong case for a serious sentence to effectuate specific deterrence. In addition, defendant's other scams, which are detailed above and in the PSR, show that this defendant must be stopped. The scams are all indicative of the same pattern of behavior – using false statements and bogus documents to obtain money. Defendant displayed this set of behavior in the advertising billboard scam (leading to his 2003 indictment), his Riverdale fraud scam (leading to this case), and his bond violations. However, defendant took it to another level when he engaged in at least seven

17

separate instances of criminal conduct where he attempted to obtain funds through fraudulent means. This included false loan applications, credit card fraud, and the fraudulent sale of the Riverdale marina. This pattern of behavior demonstrates that defendant will benefit from a term of imprisonment. Indeed, the fact that he had not served a day in prison may have been to his detriment because it has only emboldened him to commit more criminal acts.

The government also submits that general deterrence is an important factor. The use of TIF funds is growing in popularity in the Chicago area as a means to generate funds to improve city infrastructure. Cities and villages place a great deal of faith into developers that the funds will be used for the intended purposes, and they impose controls such as requiring the submission of invoices and receipts to support the use of funds. Defendant's acts, which included the submission of false invoices and receipts, circumvented those controls and used taxpayer funds for his own personal benefit. A strong sentence will send a message to other developers using TIF funds that any illicit use of the funds will be met by criminal prosecution and a significant term of imprisonment.

### D. Above Guideline Sentence

The government is seeking a sentence above the sentencing guidelines in this case for a number of reasons. First, the government submits that the loss amount of approximately $370,000, leading to a 12-level enhancement pursuant to Guideline Section 2B1.1(b)(1)(G), understates the magnitude of the offense here. Specifically, by stealing approximately $370,000 out of $900,000 in TIF funds, defendant diverted funds that were destined to repair the Riverdale marina, and those funds were badly needed to restore the marina. The Riverdale

18

marina remains half-finished and tied up in litigation, with significant liens placed on it from unpaid contractors and a substantial tax liability. The Village's investment of $900,000 in TIF funds in defendant was essentially wasted as whatever value defendant provided was evaporated.[3] Thus, defendant caused more harm to the Village of Riverdale than is reflected by the 12-level loss enhancement.

Second, the guideline range does not consider defendant's multiple schemes to violate his bond conditions, as detailed above. Third, the guideline range does not take into account defendant's seven other fraud scams, which he executed during and after the Riverdale marina fraud scheme. These scams do not constitute relevant conduct, and thus they are not accounted for in the guideline calculation. Fourth, the guideline range does not take into account that defendant committed the Riverdale scam only four months after release from probation from a prior federal conviction. For these reasons, the government submits that defendant's sentencing guideline range of 33 to 41 months' imprisonment understates the nature of the offense, defendant's history and characteristics, and the need for specific and general deterrence and to promote respect for the law. Accordingly, an above-guideline sentence is warranted in this case.

_____

3 The government anticipates that the Mayor of the Village of Riverdale will speak to the Court at sentencing and provide additional details about the effect that defendant's scam has caused on the Village.

## VI.  Conclusion

The government submits that defendant Thomas should be sentenced to a term of imprisonment of 57 months under the factors set forth in 18 U.S.C. §3553(a).

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:    _s/ Sunil R. Harjani_
SUNIL R. HARJANI
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300

April 14, 2015